UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MACSTEEL, INC. a Division of
Quanex Corporation,

        Plaintiff,

v.                                      Case No. 05-74566
                                      Honorable Patrick J. Duggan

ERAMET NORTH AMERICA,

        Defendant.

_____/

**BENCH OPINION**

I.     **Procedural Overview**

      Plaintiff MacSteel Inc. ("MacSteel") initiated this action in state court against

Defendant Eramet North America ("Eramet"), alleging that Eramet breached an

agreement to sell silicomanganese ("SiMn") for use at MacSteel's plant in Jackson,

Michigan ("Jackson Agreement").  According to MacSteel, the Jackson Agreement

included Eramet's promise to sell SiMn to MacSteel's Jackson plant during the first half

of 2004, and a "price option" MacSteel could exercise to purchase additional SiMn for

the Jackson plant during the second half of 2004.  MacSteel only alleges that Eramet

breached the price option provision in the Jackson Agreement.[1]

      On December 1, 2005, Eramet removed MacSteel's complaint to federal court

_____

[1]Eramet complied with its promise to deliver SiMn to MacSteel's Jackson facility
during the first half of 2004.

based on diversity jurisdiction, 28 U.S.C. §§ 1332 & 1441.[2]  MacSteel thereafter filed a

first amended complaint, adding a second count.  In this second count, MacSteel alleges

that Eramet also breached an agreement to sell SiMn for use at MacSteel's plant in Fort

Smith, Arkansas ("Fort Smith Agreement").  MacSteel alleges that the Fort Smith

Agreement required Eramet to sell SiMn to the Fort Smith facility during the first half of

2004, and also granted MacSteel the option to purchase additional SiMn for the same

price during the second half of 2004.

        The parties subsequently filed motions for summary judgment.  As a result of this

Court's rulings on those motions– which were set forth in an opinion and order issued on

November 16, 2006– MacSteel's claim in count II of its amended complaint that Eramet

breached the Fort Smith Agreement's price option provision was dismissed with

prejudice.  With respect to MacSteel's additional claim in count II of its amended

complaint that Eramet breached a promise to sell SiMn to MacSteel's Fort Smith facility

during the first half of 2004, the Court held that Eramet breached its promise but that a

genuine issue of material fact existed with respect to MacSteel's resulting damages.

Finally, as to MacSteel's claim that Eramet breached the price option in the Jackson

Agreement (count I), the Court held that there was a genuine issue of material fact

precluding summary judgment.  The outstanding matters were tried before this Court on

---

        [2]MacSteel is a Delaware corporation with its principal place of business in
Jackson, Michigan.  Eramet is a Pennsylvania corporation with its principal place of
business in Corapolis, Pennsylvania.

December 19, 2006.

## II.     Findings of Fact

MacSteel, a division of Quanex Corporation, is a producer/processor of engineered carbon and alloy steel bars.  SiMn is a steel alloy additive necessary for the processing of alloy steel bars.  Eramet is a global alloy supplier and its product line includes SiMn.  On December 2, 2003, Tom McElroy ("McElroy"), MacSteel's Purchasing Manager for its Jackson facility, issued a Request for Quotation ("RFQ") to several SiMn suppliers, seeking specified quantities of SiMn for MacSteel's Jackson and Fort Smith facilities during the first half of 2004.  (Trial Ex. 1.)

### A.     Eramet and Other Suppliers Respond to MacSteel's RFQ

On December 3, 2003, Thomas Pompili ("Pompili"), Eramet's Vice President of Manganese Sales, sent an e-mail containing price quotations to McElroy and Mike Weeks ("Weeks"), MacSteel's Fort Smith Purchasing Manager.  (Trial Ex. 2.)  With respect to MacSteel's Jackson facility, for 1,400 net tons of SiMn to be delivered by April 2004, Pompili quoted a price of $.32 per pound and a payment term of net 30 days.  (*See id*.) Pompili quoted the same price and payment term for 1,500 net tons of SiMn to be delivered to MacSteel's Jackson facility between January and June 2004.  (*See id*.)

MacSteel received quotes in response to McElroy's RFQ from three additional suppliers: Glencore, Minerai, and Considar.  (Trial Tr. at 10.)  In addition to quoting prices for the first half of 2004, Glencore also offered to sell SiMn at a price of $0.3375 per pound to MacSteel's Jackson plant during the second half of 2004.  (Trial Tr. at 11.)

### B.    McElroy and Pompili Negotiate and Reach an Agreement

Between 4:00 and 5:00 p.m. on December 4, 2003, Pompili and McElroy engaged in a series of telephone conversations regarding Eramet's sale of SiMn to MacSteel's Fort Smith and Jackson facilities.  During their negotiations, Pompili and McElroy discussed the payment term and a price option that would give MacSteel the option of purchasing SiMn during the second half of 2004 at the price quoted by Eramet for the first half of the year.  (Trial Tr. at 18.)

With respect to the payment term, Eramet's standard term was net 30 days; whereas McElroy requested MacSteel's standard term of second day/second month– that being, on average, 45 days.  Pompili testified that he lacked the authority to offer McElroy a net 45 day payment term without first obtaining approval from Robert Burdette ("Burdette"), Eramet's Credit Manager.  Although Pompili does not specifically recall contacting Burdette for approval, Pompili assumes that he did because he in fact agreed to MacSteel's proposed net 45 day payment term.

With respect to the price option, Pompili recalls McElroy asking for an option that would allow MacSteel to purchase SiMn from Eramet during the second half of 2004, at the price Eramet quoted for the first half of the year.  Pompili, however, does not recall any specifics of his and McElroy's conversations regarding the price option and he denies agreeing to such a term.  McElroy, in comparison, vividly remembers Pompili agreeing to a price option.  In fact, McElroy recalls that it was Pompili who provided the date by which MacSteel had to exercise the option.  For the reasons discussed below, the Court

4

credits McElroy's recollection of the agreement and finds, by a preponderance of the evidence, that Eramet agreed to the option provision contained in MacSteel's subsequent purchase orders.

First, McElroy recalls the details of his December 4 negotiations with Pompili; whereas Pompili cannot recall the details or specifics of their conversations. (Trial Ex. 19 at 44-45.). In fact, Pompili has no independent recollection of his negotiations with McElroy and testified based only on his memory of the notes he took during their conversations, an e-mail he drafted based on his notes, and a telephone conversation he had with Burdette on January 12, 2004. (*Id*. at 45.) Notably, only 40 minutes after concluding his negotiations with McElroy, Pompili had to rely on the notes he took during their telephone calls to draft an e-mail regarding the agreement because he already could not remember the agreement's specifics. (*See id*. at 29.)

Second, at 5:16 p.m. on December 4, shortly after McElroy and Pompili completed their negotiations, McElroy sent an e-mail to Weeks indicating that he had reached an agreement with Eramet and that the agreement included a price option provision:

> I placed the orders with Eramet. Note that they quoted net 30 days and they said they must hold to this, especially considering the reduced price. We agreed to stay with our standard terms (2nd day of 2nd month) and raise the Jackson price back to $.32 to compensate them, and I told Tom [Pompili] that you would call them to advise what you want to do. We have the option to extend this price through the 2nd half, and we have until the end of May to decide.

(Trial Ex. 4; Trial Tr. at 16-17.) After sending this e-mail, McElroy created an "internal

5

purchase requisition", which he described as a "pre-purchase order" because it sets forth the terms to be included in MacSteel's actual purchase order and is used by MacSteel's purchasing clerk to prepare the purchase order. (Trial Tr. at 18-19; Trial Ex. 6.) The internal purchase requisition also reflects a price option. (Trial Tr. at 19; Trial Ex. 6.)

Third, while Pompili took notes during his discussions with McElroy– as Pompili testified was his standard practice– he subsequently destroyed those notes. (Trial Ex. 19 at 16; Ex. 10 ¶ 4.) Thus the Court is unable to independently ascertain their contents. While Eramet encourages the Court to rely on Pompili's recollection of what his notes contained, the Court questions the accuracy of Pompili's memory in light of his admitted inability to remember the details of an agreement he reached forty minutes earlier. (*See supra*.)

Eramet argues that the contents of Pompili's notes and the fact that they did not reflect an option term also can be gleaned from an e-mail Pompili sent to various individuals in Eramet's sourcing department shortly after he completed his discussions with McElroy on December 4. In this e-mail, Pompili wrote:

> We have booked the following at Quanex [MacSteel] for the first half.
> Quanex Fort Smith - April Barge $0.3175, net 30 days- PO#40595
> Quanex Jackson - First half fixed price $.32, terms 2nd day 2nd month- PO47129M -1500 net
>
> John, we have also booked US Steel Gary SIMn at $0.3175 for Q1. Lets [sic] discuss our first half SIMn position in the morning before the Ameristeel quote is due at noon. Should have any [sic] answer from SI CC in the morning.

6

(Trial Ex. 3.)  During his deposition, however, Pompili explained that he sent this e-mail to Eramet's sourcing department to indicate the SiMn tonnages Eramet was committed to supply for the first half of 2004.  (Trial Ex. 19 at 51-53.)  The price option term did not impact Eramet's supplies for the first half of 2004.

Moreover, Pompili testified that he used his notebook to take notes during his telephone conversations and that his notes would contain the important points of those discussions.  (Trial Ex. 18 at 36-37.)  Pompili further testified that a price option is an essential term.  (*See id*. at 63.)  Nevertheless, although acknowledging that he discussed such an option with McElroy (*see id*. at 43), Pompili testified that "[t]here was no reference in the notes about a price option."  (*See id*. at 63.)

Fourth, there is evidence suggesting that Pompili may have agreed to the price option without proper approval and then subsequently denied doing so.  Specifically, Pompili testified that during a telephone conversation on January 12, 2004, he told Burdette that he absolutely did not agree to a price option during his negotiations with McElroy.  (Trial Ex. 19 at 33.)  According to Burdette, however, Pompili also stated during this telephone conversation that he did not agree to a non-standard payment term. (Trial Tr. at 77.)  As indicated previously, Pompili now acknowledges that he did agree to MacSteel's 45 day payment term.

Further, Pompili testified that he lacked the authority to agree to a variation of Eramet's standard 30 day payment term absent Burdette's approval.  (Trial Ex. 19 at 41.) Pompili also testified that, although he does not specifically remember obtaining

7

Burdette's approval, he assumes that he did because he agreed to MacSteel's 45 day payment term.  Burdette, however, denies giving Pompili authorization to deviate from Eramet's standard payment term.  In fact, Burdette denies talking to Pompili at all regarding such a deviation before Pompili and McElroy reached their agreement.  (Trial Ex. 19 at 32 & 112.)  If Pompili agreed to a non-standard payment term without receiving authorization, it is not unreasonable to further conclude that he would agree to a price option without authorization.

Fifth, in a letter Eramet sent to MacSteel on January 29, 2004, Eramet claimed that it had no contractual obligation to honor the option term <u>or</u> the net 45 day payment term set forth in MacSteel's Jackson purchase order because <u>both</u> were additional terms to which Eramet never agreed.  (Trial Ex. 8.)  However, in the December 4, 2003 e-mail Pompili sent to several Eramet representatives immediately following his final telephone conversation with McElroy, he specifically indicated that he agreed to MacSteel's extended payment term.  (Trial Ex. 3; Ex. 19 at 42.)  This casts doubt on Eramet's claim that the price option also was not part of Pompili's and McElroy's agreement.

Sixth, as of January 14, 2004– the date Eramet first alerted MacSteel that Eramet had not agreed to the price option and that it would not honor the parties' agreements– the price of SiMn was escalating.  (Trial Tr. at 24.)  Eramet therefore had a clear motive to renounce the agreement Pompili reached with McElroy that bound Eramet to a set– and likely lower– price during the second half of 2004.

Finally, the testimony of representatives from both parties that price options are

8

very unusual in the industry does not persuade the Court, as Eramet hopes, that Pompili did not agree to such an option.  Although rare, MacSteel in fact was offered and accepted a price option from another supplier, Minerai, in 2003.  (Trial Tr. at 34 & 36.)  Moreover, in response to MacSteel's December 2, 2003 RFQ, Glencore also offered to lock in a price for the second half of 2004, in the first half of the year.  (Trial Tr. at 11.)

### C.   MacSteel Issues Purchase Orders Based on McElroy's and Pompili's Agreement

On December 5, 2003, MacSteel issued Purchase Order No. 040595 to Eramet, reflecting MacSteel's purchase of one barge of SiMn to be delivered by March 15, 200[4], for use at MacSteel's Fort Smith facility beginning April 2004 ("Fort Smith purchase order").  (Trial Ex. 18.)  Ten days later, on December 15, 2003, MacSteel mailed Purchase Order No. 47129M to Eramet, reflecting MacSteel's purchase of a specified amount of SiMn for its Jackson facility ("Jackson purchase order").  (Trial Tr. at 20; Trial Ex. 5.)  The front page of the Jackson purchase order indicates a payment term of net 45 days and contains the following language:

> MACSTEEL HAS THE OPTION TO EXTEND THIS
> CONTRACT TO COVER 2ND HALF REQUIREMENTS
> AT THIS SAME PRICE.  THIS OPTION MUST BE
> EXERCISED BY 5/31/04.

(*See id*.)(capitalization in original.)

### D.   Eramet's Termination of Pompili and Its Response to MacSteel's Purchase Orders

On December 18, 2003, Eramet terminated Pompili.  On or about December 26,

9

2003, Cathy Pritchard at Eramet reviewed MacSteel's Jackson purchase order and prepared a sales order to ship the SiMn requested in the purchase order to MacSteel's Jackson facility. (Trial Tr. at 78-80.) On January 12 and 14, 2004, Eramet shipped SiMn to MacSteel's Jackson facility, pursuant to the Jackson purchase order. (Trial Ex. 7 & Ex. 13; Trial Tr. at 81.)

Eramet claims that it first "discovered" the price option in MacSteel's purchase orders on January 12, and that it immediately tried to contact Pompili to ascertain whether the term was part of his agreement with McElroy. (Trial Tr. at 60-62.) On January 13, Pompili called Burdette and told Burdette that he had not agreed to the price option. (*See id*. at 61-62.) The following day, Tom Kalish, Eramet's National Account Executive, telephoned McElroy at MacSteel's Jackson facility and informed him that Eramet objected to, and would not honor, the price option provision in the Jackson purchase order. (*See id*. at 22.) On the same date, Kalish also telephoned Weeks at MacSteel's Fort Smith facility and informed him that Eramet was not going to honor the Fort Smith purchase order in its entirety. (*See id*.) Weeks asked Kalish to put Eramet's position in writing. (*See id*. at 23.) On or about January 21, Weeks received an e-mail from Kalish stating, "'Do not wait for a letter.'" (*See id*. at 24.)

Counsel for MacSteel then sent a letter to Eramet on January 23, 2004, indicating that if Eramet failed to retract its repudiation of McElroy's and Pompili's agreement by January 26, MacSteel would be required to purchase its SiMn requirements from other suppliers and would seek cover damages from Eramet. (Trial Ex. 16.) On January 29,

10

counsel for Eramet responded in writing.  (Trial Ex. 8 & Ex. 17.)  With regard to the

Jackson purchase order, Eramet's counsel wrote that Eramet had no contractual obligation

to honor the extended payment term or the price option set forth in the purchase order

because both were additional terms inserted by MacSteel to which Eramet never agreed.

(Trial Ex. 8.)  With respect to the Fort Smith purchase order, Eramet's counsel contended

that the purchase order was simply an offer that Eramet never accepted.  (Trial Ex. 17.)

### E.    MacSteel Obtains SiMn from Another Supplier

In the time between Kalish's oral repudiation of the parties' agreements and

MacSteel's receipt of Eramet's counsel's letters, MacSteel had begun soliciting bids from

other suppliers for its Fort Smith and Jackson facilities' SiMn requirements.  (Trial Tr. at

26-28.)  Eventually, MacSteel secured SiMn from two suppliers, Glencore and CCMA.

(Trial Ex. 15.) Eramet does not dispute that MacSteel paid Glencore and CCMA more

than $.32 per pound for its Jackson facility's requirements during the second half of 2004,

and that the difference between what MacSteel paid those suppliers and what it would

have paid Eramet if the price option in the Jackson Agreement is enforceable is

$364,545.34.  (Dkt. No. 55 at 16; Dkt. No. 61 ¶ 61.)

With respect to MacSteel's Fort Smith facility, Eramet agreed to sell MacSteel one

barge (2.8 million pounds) of SiMn at a price of $.3175 per pound (totaling $889,000),

for use beginning April 2004. When Eramet refused to honor the Fort Smith Agreement,

MacSteel secured 2.8 million pounds of SiMn from Glencore.  (Trial Tr. at 26-28 & 96.)

MacSteel paid Glencore $.4145 and $.496 per pound for the 2.8 million pounds of SiMn,

11

for a total of $1,189,221.17.  (Trial Ex. 15; Trial Tr. at 26-28 & 96.)  The difference between the amount MacSteel paid Glencore and the amount it would have paid Eramet for the same amount of SiMn is $300,221.17.

## III.    Conclusions of Law

The parties agree that Michigan law applies in this case.  Under Michigan's Uniform Commercial Code, a contract for the sale of goods "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  MICH. COMP. LAWS ANN. § 440.2204.  The party asserting the existence of a contract has the burden of proving that the contract was in fact made.  *See, e.g., Am. Parts Co. (Detroit Body Prod. Co. Div.) v. Am. Arbitration Ass'n*, 8 Mich. App. 156, 165-66, 154 N.W.2d 5, 11 (1967).

There is no dispute that Pompili and McElroy reached an oral agreement on December 4, 2003.  There also is no dispute that, pursuant to this agreement, Eramet agreed to sell specified quantities of SiMn to MacSteel's Jackson and Fort Smith facilities during the first half of 2004, at $.32 and $.3175 per pound respectively.  For the reasons discussed in the previous section, the Court further concludes that Pompili's and McElroy's oral agreement included a price option, pursuant to which MacSteel could elect to purchase its Jackson facility's SiMn requirements for the second half of 2004, at the price agreed to by the parties for the first half of the year (i.e. $.32 per pound).

As this oral agreement involved the sale of goods for a price over $1,000, it only is enforceable if it satisfies the UCC's statute of frauds.  MICH. COMP. LAWS ANN.

12

§ 440.2201(1).  MacSteel's subsequent purchase orders satisfy this requirement.  They are

writings confirming an oral agreement between two merchants and Eramet did not object

to their contents within ten days.  MICH. COMP. LAWS ANN. § 440.2201(2).  Moreover,

with respect to the option term set forth in the Jackson purchase order, a quantity is

sufficiently stated because the purchase order refers to the  facility's "requirements" for

the second half of 2004.  *See Lorenz Supply Co. v. Am. Standard, Inc.*, 419 Mich. 610,

615, 358 N.W.2d 845, 847 (1984).  Relying primarily on the following three cases,

Eramet argues the price option provision nevertheless is unenforceable: *Le Baron Homes,*

*Inc. v. Pontiac Housing Fund, Inc.*, 319 Mich. 310, 29 N.W.2d 704 (1947); *Eaton*

*Corporation v. Easton Associates, Inc.*, 728 F.2d 285 (6th Cir. 1984); and *Clark v.*

*Muirhead*, 245 Mich. 49, 222 N.W. 79 (1928).

　　In *Le Baron Homes*, the defendant successfully moved to dismiss the plaintiff's

complaint, which sought specific performance of a purported contract to purchase real

property.  The Michigan Supreme Court held that the plaintiff was not entitled to specific

performance because he failed to make certain payments at the time required under the

option contract and therefore no contract requiring the seller to sell the property ever

ripened.  319 Mich. at 314-15, 29 N.W.2d at 706-07.  Unlike the present matter, however,

the seller in *Le Baron Homes* never repudiated the parties contract before the time expired

for the purchaser to exercise the option.  Moreover, contrary to Eramet's interpretation,

the *Le Baron Homes* court did not hold that an option is not an enforceable contract; in

fact, the court specifically stated that an option is a contract, albeit a contract by which

13

one party agrees to give the other party *the option* to purchase something instead of a contract obligating one party to sell and the other to buy something. *See id*. at 313, 29 N.W. 2d at 706.

Relying on the Sixth Circuit's statement in *Eaton Corporation* that "an optionee must exercise his option to have rights under the underlying contract," 728 F.2d at 291, Eramet further argues that the price option in the Jackson Agreement is unenforceable because MacSteel never exercised the option. In *Eaton Corporation*, however, the court specifically found that the purchaser had to exercise his option to enforce his rights under the underlying contract *because* the seller had not repudiated the parties' contract prior to the deadline for the purchaser to exercise the option. *Id*. at 290-91. Thus this Court does not read *Eaton Corporation* as holding– or even suggesting– that the holder of an option must exercise the option even after the option is repudiated by the other party.

The Court also does not read *Clark v. Muirhead* as supporting such a contention. In *Clark*, when the seller repudiated the option provision in the parties' agreement, the purchaser had two choices: (1) he could have pursued his rights under the option contract– which is what he did– or (2) he could have elected to treat the repudiation as an immediate breach. *See Grayling Take Away, Inc. v. Lauren Wholesale, Inc.*, No. 221049, 2001 WL 716935, at *1 (Mich. Ct. App. Mar. 13, 2001) (explaining the plaintiff's choices in *Clark* after the defendant's repudiation); *see also Paul v. Bogle*, 193 Mich. App. 479, 493-94, 484 N.W.2d 728, 735 (1992). The Michigan Supreme Court simply held in *Clark* that, having elected the first option and chosen to ignore the seller's repudiation,

14

the purchaser was required to strictly comply with the option provision's requirements. 245 Mich. at 50, 222 N.W. at 79.  MacSteel, in comparison, elected to treat Eramet's repudiation as an immediate breach of the parties' agreement.  When a party makes this election, it would be illogical (and probably create confusion) to require the party to also continue acting according to the contract's terms.

Accordingly, this Court now finds that Eramet also breached the option provision in the Jackson Agreement.[3]  In the opinion and order issued on November 16, 2006, the Court already concluded that Eramet breached the contract to sell SiMn to MacSteel's Fort Smith facility during the first half of 2004.  (Dkt. No. 53.)  Thus the Court must determine what, if any, damages MacSteel suffered as a result of Eramet's breach of these agreements.

MacSteel seeks "cover" damages, which are available to a buyer  under Michigan's UCC following a seller's repudiation of a contract for sale.  MICH. COMP. LAWS ANN. § 440.2712.  Section 440.2712 provides, in relevant part:

> (1) After a breach . . . the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

> (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages . . . , but less expenses saved in consequence of the seller's breach.

---

[3]Whether Eramet's conduct in January 2004 constituted a repudiation of the parties' agreement is not disputed.

15

2:05-cv-74566-PJD-WC   Doc # 62   Filed 02/26/07   Pg 16 of 17   Pg ID 1199

MICH. COMP. LAWS ANN. 44.2712.  Michigan law also imposes upon the buyer the duty
to mitigate its damages.  *See Morris v. Clawson Tank Co.*, 459 Mich. 256, 263-64, 587
N.W.2d 253, 257 (1998).  It is the defendant's burden in the subsequent breach of
contract action, however, to prove that the plaintiff failed to mitigate its damages.
*Reinardy v. Bruzzesse*, 366 Mich. 688, 691, 118 N.W.2d. 952, 953 (1962).

      With respect to the Fort Smith Agreement, Eramet agreed to deliver one barge (2.8
million pounds) of SiMn for use at MacSteel's Fort Smith facility for use beginning April
2004.  MacSteel, however, did not receive the entire 2.8 million pounds that it
subsequently purchased from Glencore during the first half of 2004; instead, some of the
SiMn was delivered during the second half of the year.  The Court nevertheless believes
that MacSteel is entitled to damages for the difference in the price it paid Glencore for the
full amount of SiMn that Eramet promised to deliver ($300,221.17).  With respect to the
Jackson Agreement, Eramet does not dispute that MacSteel incurred $364,545.34 in
damages to secure its Jackson facility's SiMn requirements during the second half of
2004.  (Dkt. No. 55 at 16.)

      Based on the above, the Court concludes that MacSteel incurred $664,766.41 in
cover damages as a result of Eramet's breach.  Eramet presented no evidence to show that
MacSteel failed to mitigate its damages.  Accordingly, the Court concludes that MacSteel
is entitled to the entire amount of its cover damages.

      A judgment consistent with this opinion shall issue.

DATE: February 26, 2007        s/PATRICK J. DUGGAN
                                      UNITED STATES DISTRICT JUDGE

Copies to:
Jeffrey G. Muth, Esq.
Daniel R. Gravelyn, Esq.
Jonathan S. Groat, Esq.
Terry A. Shulsky, Esq.